

FILED

Aug 15 2023, 8:33 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Scott H. Duerring
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

Aidan C. Burkins,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

August 15, 2023

Court of Appeals Case No.
22A-CR-1867

Appeal from the Elkhart Circuit
Court

The Honorable Michael A.
Christofeno, Judge

Trial Court Cause No.
20C01-2008-MR-4

**Opinion by Judge Bradford**
Judges Crone and Kenworthy concur.

**Bradford, Judge.**

## Case Summary

After a night of drinking and illegal drug use, the then twenty-year-old Aidan Burkins shot and killed his friend Thomas Campion and shot and injured his

friend Gregory Clark. Additionally, a stray bullet went through the outer wall of a nearby home and struck the pillow of an occupant as he was sleeping. The State charged Burkins with murder, Level 1 felony attempted murder, Level 6 felony criminal recklessness, and Class B misdemeanor marijuana possession. Burkins pled guilty to marijuana possession, a jury found him guilty of the remaining charges, and the trial court sentenced him to ninety-five years of incarceration. Burkins contends that the trial court abused its discretion in (1) admitting evidence regarding his use of psilocybin mushrooms the night of the shooting and in denying his mistrial motion based on the same evidence; (2) refusing to allow him to introduce evidence of Campion's membership in the Aryan Brotherhood; (3) allowing the State to question him on whether he had acted knowingly, intentionally, and with reckless disregard; and (4) admitting testimony that he had been on a power trip and had made remarks that he wanted to kill someone and go to jail. Burkins also contends that the prosecutor committed misconduct by mentioning facts not in evidence during closing and that his sentence is inappropriately harsh. Because we conclude that none of Burkins's arguments have merit, we affirm.

## Facts and Procedural History

[2] Burkins met Campion and Clark at work, and they would often spend time with one another outside of work, which continued after they no longer worked together. Burkins began dating Hope Koontz in March of 2019. In February of 2020, Burkins and Koontz moved in together at Meadows Trailer Park in

Nappanee, which was a heavily-populated neighborhood with other residences located nearby.

[3] On June 5, 2020, Clark and Burkins made plans for the evening, and Burkins drove to Clark's home where they smoked marijuana and drank beer. Clark and Burkins decided to visit Campion, and Burkins left his car at Clark's home while Clark drove them to Campion's home, where he lived with Emilee Malkowski and their two young daughters. The group watched Campion's daughters play and drank beer, ingested psilocybin mushrooms, and smoked marijuana.

[4] Later that evening, the group ran out of beer and decided to get more. Campion drove Clark and Burkins to a liquor store, but it was closed when they arrived, so they drove to Clark's apartment to smoke a concentrated form of THC referred to as a "dab[.]" Tr. Vol. III p. 25. Burkins, Campion, and Clark each had one dab. When the group unsuccessfully tried again to purchase beer, Burkins invited Campion and Clark to his house; he said, "We could just go back to my house and get some beer. We don't have to keep going." Tr. Vol. III p. 27.

[5] Meanwhile, starting at around 11:00 p.m., Burkins had texted Koontz several times to come pick him up, only to have withdrawn each request soon thereafter. Just before 11:40 p.m., Burkins again texted Koontz to pick him up and told her that it was "Nothing bad they f[*****] up[,]" and she agreed to come pick him up. Ex. Vol. p. 60. Burkins told Campion and Clark that he was going home, and that Koontz was going to pick him up from Clark's

house.  Campion and Clark brought Burkins to Clark's home, where Koontz was waiting.  Campion parked behind Koontz's vehicle and Burkins got out of Campion's car and into Koontz's vehicle.  When he entered Koontz's vehicle, Burkins was acting "erratic" and "frantic[.]"  Tr. Vol. IV p. 68.  Koontz told Campion that she had to work the next day and told Campion to move his car.  Campion got back into his vehicle and drove away.

[6] Koontz and Burkins began to drive home, but Burkins instructed her to go back to Clark's because he wanted to drive his own vehicle home.  Meanwhile, Clark and Campion wanted to continue to hang out with one another and wanted to obtain the beer from Burkins's home.  Campion pulled into Burkins's driveway, still intending to get the beer from Burkins.  Burkins was standing on the porch. Campion and Clark exited the vehicle.  Neither Campion nor Clark was armed with a weapon, and Burkins was aware that neither had a weapon.  Campion took a couple steps forward.  Clark saw that Burkins was holding a gun as Burkins walked down the front porch steps.  When Burkins stood at the bottom of the porch steps, he "pulled the gun up," and said, "If you take another step, I'll shoot."  Tr. Vol. III pp. 42, 72.  Campion responded, "You're not gonna really shoot me.  Are you really going to shoot me?"  Tr. Vol. III p. 43.  Burkins reiterated his warning.  After Campion stopped approximately five to six feet away from Burkins and said, "Wow, you're actually about to shoot me," Burkins shot him three times, killing him.  Tr. Vol. III p. 43.  Burkins looked at Clark and shot at him three times, hitting him twice.  Clark turned and ran into the woods located behind Burkins's home, having been shot in the hand and in

his right side at the bottom of his rib cage. Adam Easterday, who lived nearby and had been awakened by the gunfire, discovered that a bullet had passed through the outer wall of his home and had hit his pillow.

[7] Law-enforcement officers interviewed Burkins on June 6 and June 17, 2020. During a police interview, he stated that "[a] gun is like picking a fight" and "[n]o one is invincible to a gun[.]" Tr. Vol. V p. 246. Before Burkins left police custody on June 6, a blood draw was conducted. Campion's clothing was tested for gunpowder residue and other chemicals, but none were found, meaning that the muzzle of Burkins's gun had been more than three feet from Campion when it was fired.

[8] On August 24, 2020, the State charged Burkins with murder, Level 1 felony attempted murder, Level 6 felony criminal recklessness, and Class B misdemeanor marijuana possession. On June 27, 2022, Burkins pled guilty to marijuana possession and his jury trial began on the remaining charges. Burkins's theory at trial was that he had acted in self-defense. Prior to the presentation of evidence, Burkins objected to the introduction of testimony from Clark about the use of psilocybin mushrooms on the basis that Burkins's drug use constituted a prior bad act. The trial court overruled the objection and reasoned that the evidence was admissible under Evidence Rule 404(b)(2) as relevant to Burkins's intent. Burkins requested a continuing objection to evidence of mushroom consumption, which the trial court granted.

[9] Clark admitted during direct examination to having consumed alcohol, marijuana, and mushrooms the night of Campion's death and indicated that

Campion and Burkins had done the same. On cross-examination, Burkins elicited additional testimony about all three men having consumed marijuana and mushrooms. Moreover, Burkins elicited testimony about Campion's affiliation with the Aryan Brotherhood, a white-supremacist gang, including Campion's tattoos that indicated affiliation. The State also elicited testimony about Campion's affiliation with the gang, and Clark indicated that Campion's involvement had ended ten to fifteen years ago.

[10] After the State had presented its case-in-chief, Burkins moved for a mistrial based on the admission of testimony regarding Burkins's use of mushrooms. The trial court denied the motion and reaffirmed its prior ruling that the evidence was admissible because it was relevant to the question of Burkins's intent and, additionally, that it was relevant to the relationship between Campion, Clark, and Burkins.

[11] Burkins testified during his case-in-chief and stated that he had consumed marijuana, mushrooms, and beer the night of the shooting. Burkins also testified to Campion's affiliation with the Aryan Brotherhood. Burkins testified that, the night of the shooting, Campion had shown him a tattoo indicating affiliation with the Aryan Brotherhood and told him that "[i]f you mess with one of us, you get the rest of us." Tr. Vol. V p. 179.

[12] During cross-examination of Burkins, the State asked him twice if he had (1) knowingly killed Campion, (2) shot Clark with the specific intent to kill him, and (3) knowingly performed an act that created a substantial risk of bodily injury while armed with a deadly weapon when he had fired the bullet that hit

the Easterday home. Burkins did not object to the first and third of these questions, objected to the second on the basis that it had been asked and answered, and objected to the fourth on the basis that it violated Evidence Rule 704, which prohibits a witness from testifying to an opinion on an ultimate issue in the case, specifically intent. The trial court overruled Burkins's objections to the questions.

[13] During his redirect examination, Burkins asked to introduce evidence that he could face retaliation from the Aryan Brotherhood to rebut testimony that Campion was no longer affiliated with the group. The trial court denied that request. As an offer of proof, Burkins stated that evidence would have shown that, days after the shooting, he had been contacted by law enforcement and told that Campion's father had told police that the Aryan Brotherhood was coming into town, and that officers had advised Burkins and Koontz to leave the area for their own safety. The State responded that anything that happened after the shooting was not relevant to Burkins's intent at the time of the shooting; it was a collateral matter that would mislead the jury and be extremely prejudicial. The trial court reaffirmed its denial on the ground that the information was hearsay and not relevant.

[14] Prior to the State's case-in-rebuttal, Burkins objected to anticipated testimony by Clark that he had been on a power trip, wanted to kill someone, and wanted to go to jail on the ground that it was impermissible character evidence. The State recalled Clark, who testified that he believed Burkins had been on a power trip due to things he had said to Clark over the month prior to the shooting.

The jury asked what Clark had meant by a "power trip[.]" Tr. Vol. V p. 239. Burkins objected on the basis that the question called for a narrative answer that would introduce inadmissible evidence. The trial court overruled the objection. Clark responded that he believed Burkins had been on a power trip because he had said multiple times that he was ready to go to jail and was ready to kill someone.

[15] During the defense's closing argument, defense counsel stated that a toxicology screen had been conducted on Burkins. Defense counsel asked the jury, "Wouldn't you like to know what they were, in order to determine whether or not it had anything to do with this case, if she's gonna stand up here and argue impairment or anything to do with these drugs?" Tr. Vol. VI pp. 30–31. Defense counsel also stated, "And they decide, 'Nope. You don't get to see that evidence.'" Tr. Vol. VI p. 31. Additionally, defense counsel stated that the State would say Burkins was "[']high on drugs'" but "we know that's not true." Tr. Vol. VI p. 37.

[16] During the State's rebuttal to Burkins's closing, the prosecutor stated that Burkins wanted the jury to think that the State was hiding things by not submitting the blood-test results, but that it could not introduce irrelevant evidence. The prosecutor said the blood test had been conducted six hours after the shooting and that it would be irresponsible to submit the results because they were not reflective of what had happened six hours before. Burkins objected on the ground that there was no evidence presented about how long drugs remained in a person's system and that the State was arguing facts not in

evidence. The State responded that Burkins had opened the door and that it was asking the jury to rely on its logic. After overruling Burkins's objection, the trial court admonished the jury that it was to determine what the evidence shows and that it would be instructed not to make findings based on evidence that did not exist because it would be speculation.

[17] The jury found Burkins guilty of murder, attempted murder, and criminal recklessness. At sentencing, the trial court identified, as aggravating circumstances, (1) Burkins's illegal consumption of alcohol; (2) his weekly marijuana use; (3) his use of cocaine and psilocybin mushrooms; (4) his weekly recreational use of Adderall; (5) the use of a firearm in the commission of the offenses; (6) that he had shot both victims multiple times; (7) that both victims had been unarmed and he had known that they were; and (8) the harm, injury, or loss had been greater than the elements of the offenses. The trial court identified, as mitigating circumstances, (1) Burkins's and defense counsel's statements, (2) the fact that he had been twenty years old at the time the offenses were committed and twenty-two years old at the time of sentencing, (3) his lack of prior convictions, (4) his substance-abuse issues, and (5) the fact that the Indiana Risk Assessment Score had placed him in the low-risk-to-reoffend category. The trial court found that the aggravating circumstances outweighed the mitigating circumstances and sentenced Burkins to ninety-five years of incarceration.

# Discussion and Decision

# I.    Evidentiary Challenges

Burkins makes four evidentiary challenges, namely, that the trial court abused its discretion in (1) admitting evidence of other bad acts by Burkins, (2) refusing to allow Burkins to introduce evidence that Campion had still been affiliated with the Aryan Brotherhood at the time of his death, (3) admitting evidence regarding Burkins's opinions on whether he had acted knowingly or intentionally or in reckless disregard, and (4) admitting evidence that Burkins had been on a "power trip" and had mentioned that he wanted to kill someone and go to jail.  A trial court has broad discretion in ruling on the admissibility of evidence.  *Washington v. State*, 784 N.E.2d 584, 587 (Ind. Ct. App. 2003).  We will reverse a trial court's ruling on the admissibility of evidence only when it constitutes an abuse of discretion.  *Id.*  An abuse of discretion occurs only where the trial court's ruling is clearly against the logic and effect of the facts and circumstances and the error affects the party's substantial rights.  *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013).

## A.    Other Bad Acts

Burkins argues that the trial court abused its discretion by admitting evidence of illegal alcohol and drug use by Burkins and by denying his motion for mistrial due to the admission of such evidence.  As an initial matter, Burkins did not preserve this claim for appellate review as it relates to anything other than his use of psilocybin mushrooms.  To preserve a claim of trial court error, an objection must be made with the specific ground or grounds on which the objection is based.  *Mullins v. State*, 646 N.E.2d 40, 44 (Ind. 1995).  Because

Burkins did not object to the admission of evidence of alcohol or marijuana use below, he has waived those claims for appellate review.

[20] That said, we conclude that the mushroom evidence was properly admitted under Evidence Rule 404(b). Evidence Rule 404(b)(1) prohibits "[e]vidence of a crime, wrong, or other act […] to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." "This evidence may be admissible for another purpose," however, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid. R. 404(b)(2). To be admissible for another purpose, the evidence must be relevant, and the probative value must outweigh the prejudicial effect. *Fairbanks v. State*, 119 N.E.3d 564, 568 (Ind. 2019).

[21] As mentioned, the record contains ample evidence that Burkins, Campion, and Clark had ingested alcohol and illegal drugs throughout the evening. The shooting had occurred at approximately 12:10 a.m. About one hour previously, Burkins had admitted in a text message to Koontz that he had been "ducked up[,]" which he explained at trial was an attempt to communicate that he had been "f[*****] up[.]" Ex. Vol. p. 26; Tr. Vol. V p. 92. Although Burkins points to evidence that he had not been intoxicated or under the influence of drugs at the time of the shooting, that evidence is directly contradicted by his own messages to Koontz and by the evidence of alcohol and drug use throughout the evening.

[22]    We need not address the State's argument that evidence of Burkins's mushroom consumption is relevant to his intent because the evidence was relevant to the nature of the relationship between Burkins, Campion, and Clark. The nature of the relationship was disputed at trial, with Burkins claiming that he had not been good friends with Campion, while Malkowski and Clark testified that Campion and Burkins had been like family. *See Hicks v. State*, 690 N.E.2d 215, 222 (Ind. 1997) (noting that prior bad acts are usually admissible to show the relationship between a defendant and the victim). Evidence that Burkins had consumed illegal drugs with Campion could certainly support a reasonable inference that Burkins had known Campion well enough to accurately interpret his actions as non-threatening before he shot him, which would undercut his claim of self-defense. The trial court did not abuse its discretion in admitting evidence that Burkins had ingested psilocybin mushrooms or in denying his mistrial motion.[1]

---

[1] Because we have concluded that the trial court did not abuse its discretion in admitting the evidence of Burkins's mushroom consumption, it follows that the trial court also did not abuse its discretion in denying his mistrial motion based on the same evidence.

> "A mistrial is an extreme remedy invoked only when no other curative measure can rectify the situation." *Hollowell v. State*, 707 N.E.2d 1014, 1024 (Ind. Ct. App. 1999). We review a trial court's denial of a motion for mistrial only for an abuse of discretion, and its decision is afforded great deference on appeal because the trial court is in the best position to assess all of the circumstances and their impact on the jury. *Mickens v. State*, 742 N.E.2d 927, 929 (Ind. 2001). A mistrial is appropriate only where the questioned conduct is so prejudicial and inflammatory that the defendant was placed in a position of grave peril to which he should not have been subjected. *Pittman v. State*, 885 N.E.2d 1246, 1255 (Ind. 2008).

*Smith v. State*, 140 N.E.3d 363, 373 (Ind. Ct. App. 2020), *trans. denied*.

## B.  Evidence of Campion's Affiliation with the Aryan Brotherhood

[23]    Burkins contends that the trial court abused its discretion in declining to admit evidence that Campion's father had called the police and told them that the Aryan Brotherhood gang was going to come into town and that the police had advised Burkins to leave town for his safety.  Even if the trial court abused its discretion by excluding the testimony, however, the exclusion would be harmless because evidence tending to show that Campion was still involved in the Aryan Brotherhood had already been entered into evidence.  "Where the wrongfully excluded testimony is merely cumulative of other evidence presented, its exclusion is harmless error."  *Sylvester v. State*, 698 N.E.2d 1126, 1130 (Ind. 1998).  The jury had already heard testimony from several witnesses that Campion had been affiliated with the Aryan Brotherhood.  Moreover, although Clark and Malkowski testified that Campion had distanced himself from the gang, Burkins testified that Campion had told him the night of his death that he was still involved with the Aryan Brotherhood and that "[i]f you mess with one of us, you get the rest of us."  Tr. Vol. V p. 74.  Because the jury had already been presented with evidence that Campion was still active in the Aryan Brotherhood, the trial court's exclusion of other evidence to that effect, even if erroneous, can only be considered harmless.

## C.  Burkins's Testimony Regarding his Intent

[24]    During cross-examination of Burkins, the State asked, "So you would agree that on the early morning hours of June 6 of 2020, you knowingly killed Thomas Campion."  Tr. Vol. V p. 124.  Burkins did not object to this question.

Shortly thereafter, the State asked, "You knowingly killed Thomas Campion, didn't you?" Tr. Vol. V p. 124. Burkins objected on the ground that the question had been asked and answered. The trial court overruled the objection. The State also asked, "You would agree that, acting with the specific intent to kill Greg Clark, you fired a handgun at Greg Clark, which was a step toward killing him. Correct?" Tr. Vol. V pp. 128–29. Burkins did not object to this question.

[25] The State also asked Burkins, "You would agree that you knowingly performed an act that created a substantial risk of bodily injury while armed with a deadly weapon when you fired your gun in the trailer park that hit the Easterday home?" Tr. Vol. V pp. 129–30. Burkins objected on the ground that the question went to an ultimate issue reserved for the jury and that the question was essentially asking Burkins to give an opinion about whether he was guilty of criminal recklessness. The trial court overruled the objection. Burkins now challenges these questions under Evidence Rule 704, which prohibits a witness from testifying to an opinion on an ultimate issue in the case, specifically intent. Evid. R. 704(b).

[26] As an initial matter, Burkins has waived his appellate challenges to the first three questions for failing to properly object to them. Burkins did not object to the first and third questions on any basis. "[A] contemporaneous objection is generally required to preserve an issue for appeal." *Rembusch v. State*, 836 N.E.2d 979, 982 (Ind. Ct. App. 2005), *trans. denied*. "The purpose of such a rule is to promote a fair trial by precluding a party from sitting idly by and appearing

to assent to an offer of evidence or ruling by the court only to cry foul when the outcome goes against him." *Id*. at 983. As for the second question, not only was it essentially the same as the first, Burkins did not object to it on the same ground he raises on appeal, objecting below on the basis that it had already been asked and answered while claiming on appeal that its admission violated Evidence Rule 704. It is well-settled that "[a] defendant may not raise one ground for objection at trial and argue a different ground on appeal." *Small v. State*, 736 N.E.2d 742, 747 (Ind. 2000). For failing to make proper objections to the first three questions, any challenges to them are waived for appellate review.

[27] This leaves us with the fourth question, which regarded Burkins's intent to commit criminal recklessness. We conclude that Burkins's reliance on Evidence Rule 704 is misplaced. Quite simply, the State was asking Burkins what his state of mind was when he fired the shots, the answer to which question, while concerning an ultimate issue, was not his opinion but, rather, a statement of fact on a contested issue. Put another way, when Burkins responded that he had not knowingly shot at another home, he was not offering an opinion on his state of mind, he was testifying to it as a fact. Because the State's question did not seek Burkins's opinion, his reliance on Evidence Rule 704 is unavailing.

## D. Evidence that Burkins Had Been on a Power Trip

[28] Burkins contends that the trial court abused its discretion by admitting evidence that Burkins had been on a power trip because he had said that he was ready to kill someone and go to jail, arguing that this evidence is evidence of other bad

acts, which, pursuant to Evidence Rule 404(b), is inadmissible. We have little hesitation in concluding that the trial court did not abuse its discretion in this regard. Simply put, this evidence is outside the scope of Evidence Rule 404(b) because these statements relate to Burkins's feelings, and feelings are not a bad act. "To state what one is feeling, as opposed to a direct threat to the victim, is not a 'bad act' as such." *Hicks*, 690 N.E.2d at 221 n.11. Clark's testimony regarding Burkins's wish to kill someone and go to jail, because they are not bad acts, is not rendered inadmissible by Evidence Rule 404(b).

## II. Prosecutorial Misconduct

[29] Burkins contends that the prosecutor committed misconduct during closing by mentioning a toxicology report prepared following his blood draw of June 6, 2020. To find prosecutorial misconduct, a court must consider "(1) whether misconduct occurred, and if so, (2) 'whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected otherwise.'" *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014) (quoting *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006)). "'Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct.'" *Id.* (quoting *Cooper*, 854 N.E.2d at 835)). However, "[a] prosecutor has the duty to present a persuasive final argument and thus placing a defendant in grave peril, by itself, is not misconduct." *Id.*

[30] Here, because defense counsel mentioned the toxicology report first in Burkins's closing, the prosecutor was merely responding and, consequently, did not commit any misconduct. "Prosecutors are entitled to respond to allegations and inferences raised by the defense even if the prosecutor's response would otherwise be objectionable." *Dumas v. State*, 803 N.E.2d 1113, 1118 (Ind. 2004). During closing, defense counsel had strongly implied that the State was withholding evidence from the jury in bad faith and misrepresenting the evidence, stating that the report was received and asking, "Wouldn't you like to know what [the results] were, in order to determine whether or not it had anything to do with this case, if [the prosecutor is] gonna stand up here and argue impairment or anything to do with these drugs?" Tr. Vol. VI pp. 30–31. Defense counsel further stated, "And they decide, 'Nope. You don't get to see that evidence.'" Tr. Vol. VI p. 31. Additionally, defense counsel said that the State would say Burkins was "[']high on drugs'" but "we know that's not true." Tr. Vol. VI p. 37. In response, the prosecutor explained that she could not in good faith present the report because Burkins's blood had been drawn six hours after the shooting and that it would be irresponsible to submit the results that did not accurately reflect Burkins's condition at the time of the shooting. In short, the State was merely responding to the assertions of defense counsel and committed no misconduct. *See Dumas*, 803 N.E.2d at 1118.

## III. Appropriateness of Sentence

[31] Burkins contends that his ninety-five-year sentence is inappropriately harsh. "The Court may revise a sentence authorized by statute if after due

consideration of the trial court's decision, the court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). A reviewing court will give "substantial deference" and "due consideration to the trial court's decision." *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014). Whether the reviewing court regards a sentence as inappropriate turns on a "sense of the culpability of the defendant, the severity of the crime[s], the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). "The principal role of appellate review should be to attempt to leaven the outliers" and not to achieve a perceived "correct" result. *Id.* at 1225. The defendant bears the burden of persuading us that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). To carry this burden, Burkins must provide "compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and [his] character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015); *Reid v. State*, 876 N.E.2d 1114, 1116 (Ind. 2007).

[32] Burkins was convicted of murder, Level 1 felony attempted murder, Level 6 felony criminal recklessness, and Class B misdemeanor possession of marijuana. The sentencing range for murder is forty-five to sixty-five years, with an advisory sentence of fifty-five years. Ind. Code § 35-50-2-3(a). The sentencing range for a Level 1 felony is twenty to fifty years, with an advisory sentence of thirty years. Ind. Code § 35-50-2-4(b). The sentencing range for a

Level 6 felony is six months to two-and-a-half years, with an advisory sentence of one year. Ind. Code § 35-50-2-7(b). A person who commits a Class B misdemeanor may be imprisoned for not more than 180 days. Ind. Code § 35-50-3-3. Burkins's maximum exposure was therefore 118 years of incarceration, out of which he was sentenced to ninety-five.

[33] We conclude that neither the nature of Burkins's offenses nor his character warrant a revision of his sentence. "The nature of the offense is found in the details and circumstances surrounding the offense and the defendant's participation therein." *Morris v. State*, 114 N.E.3d 531, 539 (Ind. Ct. App. 2018), *trans. denied*. Burkins chose to spend the night with two of his close friends illegally consuming alcohol, marijuana, a dab, and psilocybin mushrooms. When the group ran out of beer and could not find a location to purchase more, Burkins invited Campion and Clark to his home where he had a case or two of beer. When Campion and Clark arrived at Burkins's home to get the beer, Burkins stood on his porch with a gun, did not explain his actions or retreat to the safety of his home, and shot multiple times at the unarmed Campion and Clark. *See Flowers v. State*, 154 N.E.3d 854, 873 (Ind. Ct. App. 2020) (concluding that defendant's eighty-five-year sentence for murder was not inappropriate, in part, because the shooting victim was unarmed). The shooting occurred in a heavily-populated residential area, and another bullet hit Easterday's home. *See Simms v. State*, 791 N.E.2d 225, 234 n.4 (Ind. Ct. App. 2003) (noting that the defendant firing a gun "in a residential area whereby innocent bystanders could have been injured or killed is a valid aggravating

circumstance and goes to the nature of the offense"). To summarize, after engaging in a night of illegal activities, Burkins killed the unarmed Campion, attempted to kill the unarmed Clark, and endangered others nearby, including children. Burkins's offenses were senseless and avoidable, and their nature does not warrant a sentence reduction.

[34] Burkins's character also does not render his sentence inappropriate. "A defendant's life and conduct are illustrative of his or her character." *Morris*, 114 N.E.3d at 539. Burkins was looking for a reason to shoot and kill someone and believed that a gun made him powerful, as demonstrated by photographs he took of himself holding a handgun, which he captioned "Jesus can't save you b[****]" and "F[***] you say b[****.]" Ex. Vol. pp. 94, 95. A defendant's criminal history is also reflective of his character. *Rutherford v. State*, 866 N.E.2d 867, 874 (Ind. Ct. App. 2007). Though Burkins did not have prior convictions, his criminal record now contains some of the most serious crimes possible. Moreover, Burkins has a long history of disregarding the law and consuming substances illegally, including alcohol, marijuana, cocaine, Adderall, and psilocybin mushrooms, many of which he consumed on the night of the shooting. Burkins continued to use illegal substances even after receiving treatment for substance abuse in 2018 and 2019. *See Hape v. State*, 903 N.E.2d 977, 1002 (Ind. Ct. App. 2009) (noting that a trial court does not abuse its discretion by declining to find substance abuse issues mitigating when they are known and "little or nothing to treat" those issues is done), *trans. denied*. Burkins has bragged about egregiously violating traffic laws, as shown by a

photograph he took which depicts him driving at 117 miles per hour with the caption "Zoom zoom[.]" Ex. Vol. p. 93.

[35] Burkins also has had prior contacts with the criminal justice system involving allegations that were similar in nature to the instant crimes, *i.e.*, they involved substance abuse and violence. Burkins has previously been charged with possession of marijuana and possession of paraphernalia, as well as domestic battery and intimidation in a case which was resolved with a pretrial diversion agreement. *See Rutherford*, 866 N.E.2d at 874 ("[A] record of arrests […] is appropriate to consider such a record as a poor reflection on the defendant's character, because it may reveal that he or she has not been deterred even after having been subjected to the police authority of the State."). Burkins's prior contacts with the criminal justice system clearly did not deter him from committing extremely serious crimes, which resulted in the death of one person and could very well have resulted in the deaths of others. Burkins has failed to persuade us that the nature of his offenses and his character justify a more lenient sentence.

[36] We affirm the judgment of the trial court.

Crone, J., and Kenworthy, J., concur.